UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

HAROLD WASEK,

    Plaintiff,

v.                  Case Number: 09-11350-BC
                    Honorable Thomas L. Ludington

ARROW ENERGY SERVICES, INC.,

    Defendant.
_____/

## **OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DISMISSING PLAINTIFF'S COMPLAINT WITH PREJUDICE**

  Plaintiff Harold Wasek, who resided in Isabella County, Michigan, was hired as a derrick hand to service Defendant Arrow Energy Services' oil rigs on April 24, 2008. Plaintiff was assigned to work on a rig in Pennsylvania and performed his job satisfactorily, despite "verbal abuse" from a male co-worker and three instances where the co-worker grabbed or poked Plaintiff's buttocks. On September 12, 2008—two days after one of the poking incidents—Plaintiff called his wife in Michigan for a ride home, posted a note on his hotel door saying "I'm not here I went home," and left the job site. Later that day, he called a human resources representative in Michigan and indicated he did not quit his job, he just went home. On October 3, 2008, Plaintiff attended a one-day training session in Michigan. He was then assigned to a rig in Michigan on October 21, 2008, but did not show up for his work assignment. He indicated at the time that he had accepted other employment and would not be returning to work for Defendant.

  On April 9, 2009, Plaintiff filed the instant complaint, alleging "violations" of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000e-2, and the Elliott-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws §§ 37.2101–.2804. On June, 14, 2010, Defendant filed a

motion for summary judgment, contending that Plaintiff cannot demonstrate discrimination on the basis of sex, and that his Title VII and ELCRA claims should be dismissed. The August 25, 2010 hearing was canceled based on the Court's determination that the parties papers presented the necessary factual and legal information to resolve the motion. E.D. Mich. L.R. 7.1(f).

The conduct and language employed on the oil rigs by Plaintiff and his coworkers was disrespectful and inappropriate, and would clearly have no place in a professional workplace. Indeed, employers' efforts to eliminate such crude behavior from their offices, plants, workshops, and even oil rigs seem prudent; civil working environments promote morale and productivity. Title VII was not, however, intended by Congress to encourage civility or polite behavior. It was intended to combat discrimination *on the basis of sex* in the workplace by prohibiting employers from treating men differently than women. Plaintiff has not advanced any evidence that he was verbally berated because he is a man. Plaintiff has not advanced any evidence that his buttocks was grabbed and poked because he is a man. There is no evidence, or even suggestion, that if he were a woman he would have been treated differently.

Accordingly, Plaintiff has not asserted an actionable discrimination claim under Title VII or ELCRA or engaged in the "protected activity" necessary to assert a retaliation claim. Defendant's motion for summary judgment [Dkt. # 20] will be granted and Plaintiff's complaint will be dismissed with prejudice.

**I**

Plaintiff was hired by Defendant on April 24, 2008 and assigned to work on a rig in Pennsylvania. In July 2008, three other men worked with Plaintiff on the Pennsylvania rig, including Plaintiff's immediate supervisor Pat Tripp and another derrick hand, Paul Ottobre.

Ottobre was a large and intimidating man, standing six feet five inches tall and weighing in at 330 pounds. Pl. Dep at 48. Ottobre is a convicted felon who was released from prison less than two years before his encounter with Plaintiff. [Dkt. # 26-7].

While working in Pennsylvania, Plaintiff received a per diem payment from Defendant to cover expenses like lodging. Pl. Dep. at 22–23. Plaintiff chose to share a room with Ottobre for "about a week" or two. *Id* at 22–23, 37. While sharing a room during off hours sometime in August, Plaintiff and Ottobre were discussing marriage and their wives when Ottobre made, in Plaintiff's words, "very strange" comments about engaging in sexual intercourse with his wife's sister. Pl. Dep. at 34–37. Ottobre moved out of the room the next day. *Id.* at 42.

The first touching incident occurred sometime later while Plaintiff was bent over "tripping pipe on the rig floor." *Id.* at 38. Plaintiff felt Ottobre's hand on his buttocks and immediately responded, "Hey, don't touch me, period. Don't ever put your hands on me." *Id.* Ottobre and the other crew members, including Tripp, laughed, as though they thought the incident was funny. *Id.* Ottobre, Plaintiff said, "thought it was a big joke." *Id.* Plaintiff later complained of the incident to Tripp in Tripp's hotel room, informing the rig supervisor that he did not think Ottobre's conduct was funny and indicating that he would not tolerate future inappropriate touching. *Id.* at 39–40. Tripp accepted some responsibility for Ottobre's conduct and indicated that he would "take care of it." *Id.* at 40–41.

Before and after the touching incident, Ottobre directed comments at Plaintiff that Plaintiff believed to be inappropriate and sexual in nature. *Id.* The comments included: "Boy, you have a pretty mouth."; "Boy, you have pretty lips."; and "You're a fucking worm." *Id.* at 40–43. Ottobre made the comments repeatedly during the period of time he worked with Plaintiff. *Id.*

The second touching incident occurred in late August or early September 2008. *Id.* at 44–47. Plaintiff was again bent over on the rig floor, "plumbing up a pump," when Ottobre poked him in the buttocks with a hammer handle. *Id.* Plaintiff responded by turning to Ottobre and stating: "Hey, don't fucking touch me, Paul. I'm not gay. I don't appreciate it. Leave your hands off my ass, faggot." *Id.* at 46. Ottobre responded by laughing. *Id.* Plaintiff stated that Ottobre "thought it was funny." *Id.*

After the poking incident, Plaintiff became increasingly "intimidated, . . . uncomfortable, [and] aggravated." *Id.* at 48–49. The verbal abuse from Ottobre continued, along with "a lot" of arguing between Plaintiff and his co-worker. *Id.* Plaintiff testified at his deposition concerning his state of mind:

> I was getting to the point that I just wanted to leave and remove myself from the situation because I felt that not only had I complained once to [Tripp] and I presume—I don't know—that nothing was said to [Ottobre] because he did it again. And all the verbal from [Ottobre] to me every single day was allowed to continue. [Tripp] did nothing. So I was getting to be at wits end with the whole situation. But realizing that I have a lot of bills to pay, I felt that I had to stay there and continue to earn money.

*Id.* at 49–50.

In early September Plaintiff was on the "half pit monitoring a flow back" when he felt something poke him in the buttocks again. *Id.* at 50. He turned around and observed Ottobre holding a three-foot long rod with a three-quarter inch diameter. *Id.* As he had after the first two incidents, Plaintiff responded directly, and profanely, indicating that he was not gay and that he did not want to be touched. *Id.* at 50-51. Also like before, Ottobre laughed. *Id.* He believed the incident was funny. *Id.* Still, Plaintiff continued on the job and "did not make waves" because Tripp had emphasized several times, according to Plaintiff, that if an employee complained he would

-4-

be "put on the shelf or . . . put on a starvation diet." *Id.* at 51 (quotation marks omitted). "[I]f you complain, you're a whiner, they won't put it up with; [sic] they'll get rid of you." *Id.*

On September 10, 2008, as Ottobre's verbal abuse continued, Plaintiff confronted Ottobre on the rig, saying "[o]ne more word out of you and I'm coming to that pipe trailer and I'm busting your head." *Id.* at 52. Tripp told both men to go back to work, and Ottobre and Plaintiff did not speak during the rest of the day. *Id.* at 53. When the crew was changing clothes after work that evening, Ottobre stated that Plaintiff "better be ready" if he confronted Ottobre again because he would do "something about it." *Id.*

Later that evening, Plaintiff noticed that his Styrofoam cooler was missing from the truck and he found it in the dumpster outside the motel. *Id.* at 57. Plaintiff believed Ottobre took it. *Id.* The next morning, September 11, 2008, he returned to work and discovered that $100 had been stolen from his wallet and that some of his cigarettes were missing. *Id.* The theft occurred on the rig and Plaintiff believed it had been perpetrated by Ottobre. *Id.* Plaintiff did not raise his concerns about the theft, choosing to remain silent throughout the workday. *Id.*

That evening, Plaintiff went to Ottobre's motel room looking for the keys to a truck so Plaintiff could do laundry and eat at a restaurant located one-half mile away. *Id.* at 53–54. Ottobre refused, indicating that he had just put $30 in fuel in the truck and that Plaintiff could not use it unless he also put fuel in it. *Id.* Plaintiff returned to his room and called a supervisor in Michigan, Dick Smillie. *Id.* at 55. Plaintiff told Smillie about the key incident as well as about the "grabbing" and "poking" incidents and the verbal abuse. *Id.* Smillie initially told Plaintiff to just "kick his ass," but eventually agreed to call Ottobre and speak to him. *Id.* Smillie then called Plaintiff back and told him to go get the keys from Ottobre because Smillie had spoken with him. *Id.*

When Plaintiff returned to Ottobre's room, Ottobre had left with the truck. *Id.* Plaintiff then called Bill Strong, an area supervisor who apparently managed Tripp and reported to Smillie. *Id.* at 56. Strong berated Plaintiff for calling Smillie with his "petty ass whining" and directed Plaintiff to report to work the next morning to "duke it out" with Ottobre. *Id.* Plaintiff indicated to Strong that he would not report to work again unless the situation with Ottobre was resolved. *Id.* at 57. Strong indicated he was not going to do anything about the situation that evening. Plaintiff then called his wife to pick him up and take him home, and the next day, September 12, he taped a note to his motel room stating "I'm not here I went home Harold." *Id.* at 64. While traveling back to Michigan on September 12,[1] Plaintiff spoke with a human resources representative named Erica Comei and indicated to her that he left the rig in Pennsylvania because he could no longer work with Ottobre. *Id.* at 66–67. He indicated to Comei that he did not intend to resign his employment. *Id.*

A few days after he left the rig in Pennsylvania, Comei set up a meeting involving Plaintiff, Rob Short, a salesman, and Smillie at Defendant's offices in Mt. Pleasant, Michigan. *Id.* at 66–72. Short initiated the meeting, and indicated that he was upset with Plaintiff for leaving the job in Pennsylvania. *Id.* Short told Plaintiff he would not work in Pennsylvania again. *Id.* Plaintiff reiterated his complaints about Ottobre, and played a recorded voice mail message from Ottobre for Short and Smillie. *Id.* In the message, Ottobre tells Plaintiff "I miss you. I miss holding you. I miss seeing you. I love you." *Id.* at 72. Ottobre also mentions "spooning" with Plaintiff. Def.'s Mot. at 7.

On October 3, 2008, Plaintiff attended a safety meeting in Mt. Pleasant. On October 12, 2008, he traveled to West Virginia to begin working for Stone Well Service. On October 21, 2008,

---

[1] Comei testified that the conversation took place on September 15. Comei Dep. at 18.

he did not report as directed to one of Defendant's rigs in Michigan, choosing to continue working for Stone Well Service instead. On April 9, 2009, he filed a complaint against defendant, alleging "violations" of Title VII and ELCRA.

## II

A motion for summary judgment should be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of informing the Court of the basis for its motion, and identifying where to look in the record for relevant facts "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. Pro. 56(e)(2); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). If the opposing party does not raise genuine issues of fact and the record indicates the moving party is entitled to judgment as a matter of law, the court shall grant summary judgment. *Anderson*, 477 U.S. at 250.

The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party opposing the motion may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary

judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

### III

Plaintiff's complaint does not clearly state how he believes Defendant "violat[ed]" Title VII and ELCRA, but it appears from his response that he is asserting two distinct claims. First, that Ottobre's actions and comments created an objectively hostile work environment that "alter[ed] the conditions" of his employment and "created an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Second, that after Plaintiff reported Ottobre's behavior, Defendant retaliated against him by not assigning him to a new rig.

### A

Both ELCRA and Title VII prohibit employers from discriminating against employees based on sex. *See* 42 U.S.C. § 2000e-2(a)(1); Mich. Comp. Laws § 37.2102; *Chambers v. Tretco, Inc.*, 614 N.W.2d. 910 (Mich. 2000). Michigan courts frequently look to Title VII case law for guidance in applying ELCRA. *Plumb v. Abbott Labs.*, 60 F. Supp. 2d 642 (E.D. Mich. 1999). Neither party has suggested that a material difference in the statutes would lead to different results in this case. Accordingly, the Court's analysis will focus on Title VII and federal case law applying it in same-sex discrimination cases.

Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has interpreted the words "terms" and "conditions" broadly based on Congress's "intent to strike at the entire spectrum of disparate treatment of men and

women in employment." *Onacle v. Sundowner Offshore Sys., Inc.*, 523 U.S. 75, 78 (1998) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)). Accordingly, "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris*, 510 U.S. at 21.

Claims that an abusive working environment has changed the terms and conditions of a Plaintiff's employment are commonly referred to as hostile work environment claims. Such claims can be brought by men as well as by women, *Onacle*, 523 U.S. at 78 (citing *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 682 (1983)), and the mere fact that the alleged perpetrator is the same sex as the claimant does not automatically bar a claim, *id.* at 79.

> As some courts have observed, male-on-male sexual harassment in the workplace was assuredly not the principal evil Congress was concerned with when it enacted Title VII. But statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.

*Id.* at 79–80.

Still, Title VII is not a "general civility code for the American workplace." *Id.* at 80. Title VII does not prohibit all verbal harassment or unwanted touching; it is intended to reach only discrimination because of sex. *Id.* "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* (citation and quotation marks omitted); *see also* 29 C.F.R. 1604.11(a)(noting that hostile work environment claims are actionable under Title VII where the harassment occurs "on the basis of sex"); *Williams v. Gen. Motor Corp.*, 187 F.3d 553, 560 (6th Cir. 1999) (setting forth the prima facie elements of a hostile work environment claim, including the

requirement that the harassment was "based on" the plaintiff's sex).

Defendant contends that there is insufficient evidence that Ottobre targeted and harassed Plaintiff because Plaintiff is a man. Plaintiff responds that Ottobre was "a person whom he considered to be possibly bi-sexual" and that he was scared of Ottobre because of his size. Pl.'s Resp. at 10.

As the Supreme Court explained in *Onacle*, an inference of discrimination based on sex is "easy to draw in most male-female sexual harassment situations, because the challenged conduct typically involves explicit or implicit proposals of sexual activity." *Id.* at 80. In such cases, it is "reasonable to assume" the harasser would not have made the proposal to another man. *Id.* But in male-male harassment situations, it is often more difficult to determine whether the claimant was targeted because he is a man. If there is "credible evidence" that the harasser is gay, the same inference is often available; courts can infer that the conduct was based on sexual desire and a person of the opposite sex would not have been targeted. *Id.* Moreover, harassing conduct need not be based on sexual desire. Therefore, conduct that demonstrates "general hostility" to persons of a certain sex may often be actionable. Similarly, in a mixed-sex workplace, comparative evidence demonstrating the harasser treats men differently than women may provide the necessary inference to support a hostile discrimination claim. *Id.*

Here, Plaintiff's only effort to connect Ottobre's conduct to Plaintiff's sex is the suggestion that Ottobre was "possibly bi-sexual" and therefore acted out of sexual desire. However, Plaintiff's belief that Ottobre was "possibly bi-sexual" does not constitute "credible evidence" that his harasser was gay. *See Onacle*, 523 U.S. at 80. First, Plaintiff offers little factual support for his beliefs about Ottobre's sexual orientation. Although Ottobre's conduct toward Plaintiff may, in other

circumstances, constitute supporting evidence, because the context makes clear that Ottobre was not acting out of sexual desire such an inference is not available in this case. Plaintiff testified in his deposition that after each of the "grabbing" or "poking" incidents Ottobre laughed or otherwise indicated that it was a "big joke." Ottobre believed harassing Plaintiff was funny, not sexually gratifying.

Moreover, the record indicates that Ottobre was a bully; a man who enjoyed mentally and physically tormenting weaker people around him. It further indicates that Ottobre quickly realized that Plaintiff was sensitive to suggestions that he was gay, and that Ottobre enjoyed exploiting Plaintiff's sensitivity. It does not, however, indicate that Ottobre's enjoyment was sexual in nature or that he targeted Plaintiff because of his sex.

Even if Plaintiff could present credible evidence that Ottobre was "bi-sexual," it would still remain difficult to infer that Ottobre targeted Plaintiff because he is a man. In the run of the mill male-female hostile work environment case, the inference is that the man harassed the woman in a way that he would not have harassed a man because the harasser was sexually attracted to the woman in a way he would not have been toward a man. Similarly, if the harasser was gay, a jury could infer that the harasser targeted a man in a way that he would not have targeted a woman because the harasser was sexually attracted to the man in a way he would not have been toward a woman. In this case, Plaintiff suggests his harasser is bi-sexual, i.e., he was sexually attracted to both men and women. Accordingly, the inference that Ottobre would not target a woman in a similar fashion is no longer "easy to draw." *Id.*

Plaintiff has not offered sufficient evidence that Plaintiff was targeted by Ottobre because he is a man. *Onacle*, 523 U.S. at 79–81; *see also Radtke v. Everett*, 442 Mich. 368, 382 (1993)

(concluding that sexual harassment claims under ELCRA require proof that "but for" the fact of a plaintiff's sex, that person "would not have been the object of harassment") (citations and quotations omitted). Accordingly, Plaintiff's discrimination claims will be dismissed.

**B**

Plaintiff has also alleged retaliation claims under ELCRA and Title VII against Defendant. To establish a retaliation claim under ELCRA and Title VII, a plaintiff must demonstrate: (1) he engaged in a protected activity; (2) the defendant was aware of this activity; (3) that the defendant subsequently took an employment action adverse to the plaintiff; and (4) that the protected activity was a significant factor in the adverse employment action. *Polk v. Yellow Freight Sys., Inc.*, 876 F.2d 527, 531 (6th Cir. 1989); *Minnis v. McDonnell Douglas Technical Servs. Co.*, 162 F. Supp. 2d 718, 739 (E.D. Mich. 2001).

Defendant contends that Plaintiff's retaliation claims should be dismissed because Plaintiff did not engage in protected activity, and even if he did, Defendant was not aware that he engaged in such activity. Plaintiff responds that when he "complained about Ottobre and refused to work with him" he engaged in a protected activity. Plaintiff does not provide any additional argument or legal authority to support his assertion that "complain[ing] about Ottobre and refus[ing] to work with him" was a protected activity. Pl.'s Resp. at 13.

An employee can "engage in a protected activity" in either of two ways: "(1) when an employee has made a charge of discrimination, filed a complaint of discrimination, or otherwise participated in enforcement proceedings ('the participation clause'); or (2) when an employee 'has opposed a violation [of the Act]' (the 'opposition clause')." *Minnis*, 162 F. Supp. 2d at 738–39 (quoting *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312 (1989)) (alterations in

original).

Here, Plaintiff did not participate in an enforcement proceeding, he merely "complained" about what he believed to be a violation of Title VII and ELCRA; he "opposed a violation" of the anti-discrimination provisions of the statutes. *See Booker*, 879 F.2d at 1312. Plaintiff's claim, however, has a fatal flaw. Although he *believed* he was "opposing" a violation of the statute, he was not *actually* "opposing" a violation of the statute. *See Comiskey v. Auto. Indust. Action Group*, 40 F. Supp. 2d 877, 898 (E.D. Mich. 1999) ("In order to engage in a 'protected activity', a plaintiff must actually oppose activity that, if true, would be a violation of the civil rights law.") He complained about harassing and abusive conduct, but not the type of harassing and abusive conduct that is prohibited by Title VII and ELCRA. Because Plaintiff complained about activity that did not violate the law, the anti-retaliation provisions of Title VII and ELCRA do not apply either. Even if Defendant ended Plaintiff's employment or cut his hours because Plaintiff complained about Ottobre, doing so did not violate Title VII or ELCRA. Accordingly, Plaintiff's retaliation claims will be dismissed as well.

## IV

Accordingly it is **ORDERED** that Defendant's motion for summary judgment [Dkt. # 20] is **GRANTED**.

It is further **ORDERED** that Plaintiff's complaint is **DISMISSED WITH PREJUDICE**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: September 29, 2010

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 29, 2010.

         s/Tracy A. Jacobs
         TRACY A. JACOBS